Gwendolyn **MOORE**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 94–CF–596.

District of Columbia Court of Appeals.

Argued Feb. 13, 1996.

Decided May 2, 1996.

---

Jacqueline Gerson, with whom Jeffrey T. Green was on the brief, Washington, D.C., for appellant.

Eumi Choi, Assistant United States Attorney, with whom J. Ramsey Johnson, Acting United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese, III, and Cynthia G. Wright, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and FARRELL and REID, Associate Judges.

REID, Associate Judge:

Appellant Gwendolyn Moore was indicted on a charge of assault with intent to commit robbery while armed, in violation of D.C. Code §§ 22–501 (1995 Supp.) and –3202 (1995 Supp.) She was found guilty after a jury trial, given a suspended sentence of ten to thirty years, and placed on probation for a period of five years. She appeals her conviction and sentence on three grounds: the trial court (1) failed to conduct an adequate *Monroe–Farrell*[1] inquiry into her pre-trial complaints of

---

1. *See Monroe v. United States*, 389 A.2d 811 (D.C. 1978), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978), and *Farrell v. United States*, 391 A.2d 755 (D.C.1978). No motion regarding effective assistance of trial counsel was filed under D.C. Code § 23–110 (1989 Repl.).

ineffective representation by her counsel; (2) erroneously denied her Sixth Amendment right to a speedy trial; and (3) erred in admitting into evidence the lay opinion of a police officer concerning whether she was under the influence of drugs at the time of her arrest.

## FACTUAL SUMMARY

Gwendolyn Moore tried to grab the brief case of Alicia Bambara on December 13, 1991, near Union Station. When Ms. Bambara refused to release her briefcase, the two women struggled. Ms. Moore used a closed knife to strike Ms. Bambara around the head in an effort to gain possession of the briefcase. A passerby interceded and Ms. Moore walked away. She was apprehended later by Officer Michael Austin. Another officer, James Lieffring, took Ms. Moore into custody and retrieved the knife from her.

Ms. Moore was indicted on January 8, 1992, and arraigned on January 22, 1992. Trial was scheduled to commence on June 12, 1992. On that day, Ms. Moore indicated that she wanted to plead guilty to the charge of assault with intent to rob. The trial judge refused to accept the plea of guilty when Ms. Moore stated she could not remember striking Ms. Bambara since she was under the influence of drugs.[2] Trial was set for November 19, 1992.

On July 15, 1992, Ms. Moore sent a letter to the trial court requesting a new attorney. She stated in part:

I have tried to communicate with Mr. Patrick L. Knight in reference to my case and some rehabilitation assistance. I have tried to change my plea to guilty, I have also asked for assistance for a drug program. At this time Mr. Patrick L. Knight

has not responded to me. Therefore I do not feel that he is interested in my case.

At a hearing on August 19, 1992, the trial judge discussed Ms. Moore's dissatisfaction with her and her counsel, Mr. Knight.[3] Mr Knight explained that Ms. Moore was "dissatisfied with my services, basically." The reasons were Mr. Knight's inability to get her into a drug program despite his efforts, and her continuing desire to plead guilty despite that trial judge's ruling. When the trial judge asked Ms. Moore what were her "problems, concerns with Mr. Knight," she responded:

Well, Mr. Knight did give me a list of names and numbers of drug treatment programs, and I did call them. They said I can go to D.C. General detox, which I don't have to pay, but the majority of them said I would have to some type of medical insurance or cash payments to get into the program, which I do not have. And, I have attempted on several occasions to contact Mr. Knight, which I have a list and dates and times that I did call, and all I did was get in response was an answering service. And, finally, Friday, I did get into a drug treatment program, which is an outpatient program, that will last somewhere between sixteen to twenty weeks at Whitman Walker....

When the trial judge asked "what are your complaints about Mr. Knight's performance," Ms. Moore again talked about her efforts to get into a drug treatment program. In response to the trial judge's question as to whether "the case is not being prepared for trial," Ms. Moore once again began to discuss her endeavors to get into a drug treatment program.

On November 19, 1992, there was no judge available to conduct the trial. A new trial

---

See *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**2.** The trial judge scheduled a competency hearing for June 18, 1992. Ms. Moore was seen by a psychologist on June 12, 1992. He submitted a letter report indicating that Ms. Moore's memory was unimpaired, except for "the events surrounding the alleged offense and her arrest by the police." According to the report, Ms. Moore stated that she had taken "a substantial amount of crack cocaine" on the day of the assault, and

that "she had been using $150–$400 worth of cocaine daily for a period of two and a half years" but had stopped using the drug when she entered substance abuse counselling. The psychologist concluded that she was competent to stand trial.

**3.** The transcript or tape of the conversation was not part of the original record on appeal. However, it was discovered and provided to this court after oral argument.

was scheduled for April 13, 1993. On April 13, 1993, no judge was available, and trial was scheduled for August 25, 1993. The government filed a motion on July 28, 1993, to continue the trial date because Ms. Bambara had scheduled vacation for the month of August. On August 25, 1993, defense counsel indicated that he had not received the government's motion for a continuance. He "move[d] to dismiss for want of prosecution." The trial court denied the motion to dismiss, and scheduled trial for December 2, 1993.

Defense counsel did not appear in court on December 2, 1993, and the trial date was moved to December 3, 1993. No judges were available on December 3, and trial was set for March 7, 1994. Due to an insufficient number of jurors for the pool, the trial was put off until the following day. Trial commenced on March 8, 1994 and the jury rendered a guilty verdict on March 10, 1994.

### THE MONROE–FARRELL ISSUE

■ In *Monroe* we held that: "When a defendant makes a pretrial challenge to the effectiveness of counsel ... on the ground that counsel, due to lack of investigation, preparation, or other substantial reason, is not rendering reasonably effective assistance, the trial court has a constitutional duty to conduct an inquiry sufficient to determine the truth and scope of the defendant's allegations." 389 A.2d at 820. The trial court has *"to decide whether counsel has consulted* with the defendant and prepared his case in a proper manner." *Id.* at 819. One of the criteria "for determining whether counsel's preparation falls within the range of competence required by defense counsel in a criminal case" is "whether counsel conferred with the defendant as often as necessary and advised him of his rights...." *Matthews v. United States,* 459 A.2d 1063, 1065 (D.C. 1983). With respect to the nature of the inquiry required under the *Monroe–Farrell* doctrine, "a mere routine inquiry—the asking of several standard questions"—is insufficient. *Farrell, supra* note 1, 391 A.2d at 761–62. The defense counsel must be questioned "directly, on the record, about the specifics of the [defendant's] complaint" before any ruling is made. *Nelson v. United*

*States,* 601 A.2d 582, 592 (D.C.1991); *see also McFadden v. United States,* 614 A.2d 11, 16 (D.C.1992).

■ We conclude that the trial court satisfied the requirement of a *Monroe–Farrell* inquiry. The trial judge asked Ms. Moore what were her concerns or problems with Mr. Knight. Her response centered on her efforts to get into a drug treatment program. When the trial judge sought to determine twice whether Ms. Moore had any complaints about Mr. Knight's preparation for trial, she again discussed her efforts to get into a drug treatment program. We conclude that her concerns centered on treatment for drug addiction and not Mr. Knight's preparation for trial. We reject Ms. Moore's contention that the trial court failed to conduct an adequate *Monroe–Farrell* inquiry. The trial judge's inquiry satisfied the *Monroe–Farrell* requirement.

### THE SPEEDY TRIAL ISSUE

■ Ms. Moore argues that she was denied her Sixth Amendment constitutional right to a speedy trial because of the two and a half year period between her arrest and her trial. We disagree. In *Barker v. Wingo,* 407 U.S. 514, 530–32, 92 S.Ct. 2182, 2191–93, 33 L.Ed.2d 101 (1972), the Supreme Court of the United States identified four factors to be used in determining whether a defendant has been deprived of the right to a speedy trial: (1) the length of delay; (2) the reasons cited by the government to justify delay; 3) the defendant's responsibility to assert the right; and 4) prejudice to the defendant.

### Length of Delay and the Government's Justification

■ "[D]elay of more than a year gives *prima facie* merit to a claim that an accused has been denied the right to a speedy trial, creates a presumption of prejudice, and shifts the burden to the government to justify the delay." *Graves v. United States,* 490 A.2d 1086, 1091 (D.C.1984) (en banc). This court has recognized three types of delay: (1) deliberate or intentional delay by the government; (2) significant delay by the government (not deliberate "but more culpable

than neutral"); and (3) neutral or institutional delay. *Id.* at 1092. The record before us reveals no deliberate or intentional delay by the government, but does contain reasonable explanations justifying the delay that took place.

Virtually all of the delay in this case may be described as neutral or institutional due to the unavailability of any judge, an insufficient jury pool, and the normal wait between arrest, arraignment and the first trial date. Only approximately three months could arguably be regarded as significant delay based upon the absence of a vacationing complaining witness who had four months notice regarding the trial date.[4] On the record before us we conclude that the delay was not "unreasonable" under the circumstances since most of it was "neutral time that was attributable to ordinary pretrial proceedings and to the heavy case load of the trial court." *Graves, supra,* 490 A.2d at 1096, 1098. Nor do we see any evidence of "bad-faith delay." *See Doggett v. United States,* 505 U.S. 647, 656, 112 S.Ct. 2686, 2693, 120 L.Ed.2d 520 (1992).

**Assertion of the Right To A Speedy Trial**

Ms. Moore never clearly asserted the right to a speedy trial. She contends that defense counsel's August 25, 1993, motion to dismiss for want of prosecution constituted an assertion of the right. In *Turner v. United States,* 622 A.2d 667, 678 (D.C.1993), however, we stated:

> While a motion to dismiss is "some indication of desire for a speedy trial," its significance is diminished by the failure "to move in the alternative for an immediate trial."

(quoting *Graves, supra,* 490 A.2d at 1100). No alternative motion for an immediate trial was made in this case. Thus, as in *Turner* Ms. Moore's assertion of her right to a speedy trial, was insufficiently clear "to be weighted heavily in the speedy trial analysis." *Id.* at 679. Any weight accorded her motion to dismiss would be only minimal. *Turner,* 622 A.2d at 678–79, *Graves,* 490 A.2d at 1099.

**Prejudice To Ms. Moore**

We do not see any prejudice to Ms. Moore resulting from the delay in the trial date. She was not subjected to pretrial incarceration. Moreover, although she claimed that she suffered from anxiety and concern, there is no direct evidence of anxiety in the record before us. Even if some degree of anxiety could be inferred from her letter of July 25, 1992, and assuming it continued thereafter, it is still too insubstantial a factor on this record to weigh in favor of dismissal.

Ms. Moore also argues that because the police officer who first arrived on the scene of the crime died before trial, she was hampered in her trial preparation. Specifically she claims a lost opportunity to question the deceased police officer, Officer Austin, about her behavior and demeanor at the time of the crime to support her drug intoxication defense. There is no indication, however, as to when Officer Austin died, and whether defense counsel could have questioned him prior to his death. Moreover, Ms. Moore's contention that: "There is a strong possibility that Officer Austin could have provided details directly supporting [her] defense ...," is mere conjecture.

Ms. Moore maintains that she was prejudiced by loss of memory concerning the events surrounding her arrest. In essence, she attributes her loss of memory to the delay between her arrest and her trial. However, Ms. Moore was interviewed by a psychologist on June 12, 1992, to determine her competency to stand trial. In his written report regarding the interview, the psycholo-

---

4. The six month period from December 13, 1991, the date of arrest, to June 12, 1992, the first scheduled date for trial, represents neutral delay attributable to ordinary pretrial proceedings. The five month period from June 18, 1992, the date of the competency hearing, to November 19, 1992, the second scheduled trial date, is also best characterized as neutral or institutional delay, as is the nine month period between November 19, 1992 and August 25, 1993, caused by the unavail-

ability of a judge on two different occasions. However, the three month period between August 25, 1993 and December 2, 1993, arguably could be characterized as significant delay due to the absence of the complaining witness who was on vacation, despite the four month advance notice concerning the trial date. The three month delay between December 1, 1993 and March 7, 1994, is neutral or institutional delay attributable to the unavailability of a judge.

gist stated that Ms. Moore did not remember events surrounding her arrest. Hence, the passage of time could not be blamed for her memory loss. In sum, we see no prejudice to Ms. Moore flowing from the delay in her trial.

Based on the foregoing reasons, we conclude that there was no violation of Ms. Moore's right to a speedy trial under the factors set forth in *Barker, supra.*

## THE ISSUE OF THE POLICE OFFICER'S LAY TESTIMONY

■ Ms. Moore contends that the trial judge committed reversible error by allowing Officer Lieffring, the second officer to arrive at the scene of the crime, to give a lay opinion as to whether Ms. Moore was under the influence of drugs at the time of her arrest. The trial judge refused to permit Officer Lieffring to testify as an expert, but did allow him to offer a lay opinion. Officer Lieffring testified that he had previously arrested approximately ten persons who were under the influence of drugs. He was finally asked:

Q. Officer, when you saw the defendant, did you believe she was under the influence of drugs?

He responded:

A. At the time, no.

There was no objection to the specific question posed, but defense counsel had already noted his objection to the police officer's qualification to render an opinion as to whether Ms. Moore was under the influence of drugs.[5]

■ *Harris v. District of Columbia,* 601 A.2d 21, 24 (D.C.1991) determined that: "The rationale for allowing lay opinion on whether an individual appeared intoxicated by alcohol or insane also calls for allowing lay opinion on whether an individual appeared to be under the influence of drugs." *Harris* "[required] that a foundation be laid before a police officer is allowed to testify that the defendant appeared to be under the influence of drugs." *Id. Harris* specified how the proper foundation is to be made:

A proper foundation can be laid for such lay opinion testimony by an officer who has observed the allegedly impaired driver by adducing testimony that the officer has had a reasonable amount of experience observing people who were under the influence of drugs. The trial court must also satisfy itself that the officer has an adequate factual basis for an opinion regarding the condition of the defendant.

*Id.* (citation omitted). Here, Officer Lieffring a police officer with five years' experience, testified that he had previously arrested some ten people who were under the influence of drugs. The *Harris* court declined to set forth how much experience a police officer must have with persons under the influence of narcotics, and left the determination to the "discretion of the trial judge." *Id.* at 24, n. 3. We conclude that the trial judge did not abuse his discretion in deciding that experience with about ten per-

---

5. Either the trial judge intervened, or objections were raised and sustained to the following questions put to Officer Lieffring by the prosecutor: Describe what your experience has been when you have arrested people who are under the influence of narcotics.... Officer, do you believe the defendant was in any type of drug induced stupor?.... Officer, do you believe that the defendant was under the influence of narcotics?
After the first objectionable question, the trial judge told the jury in pertinent part: "What you need to hear is the testimony about how the defendant was supposed to have been acting, and you've got to make the assessment as to whether or not you believe she was under the influence of drugs or intoxicated at that time. But he is not qualified as an expert to give that type of opinion. So, disregard that testimony." When the

question regarding "drug induced stupor" was posed and an objection was raised, the trial judge called the counsel to the bench and indicated that he did not know what the term meant. Counsel indicated that the term meant whether Ms. Moore was "under the influence of drugs." Although counsel for Ms. Moore stated: "I don't think he is qualified to make that—," the trial judge interrupted to say, in part: "Well, I think a lay person can say whether someone is intoxicated." When defense counsel pointed out that the issue involved "being high on cocaine," the trial judge pointed to Officer Lieffring's experience with approximately ten people who had been under the influence of narcotics. The officer instructed the government to rephrase the question: "Officer do you believe that the defendant was under the influence of narcotics"?

sons under the influence of narcotics was sufficient to qualify as "a reasonable amount of experience." From Officer Lieffring's testimony, it is also clear that he had an adequate factual basis for his opinion concerning whether he believed Ms. Moore was under the influence of drugs. He described her demeanor when he arrived on the scene: "To me, she was very calm ... about the situation." He looked into Ms. Moore's eyes and said that: "They were normal." He saw her nose and stated that: "It was normal."

We see no problem with the form of the question ultimately posed to Officer Lieffring. *Harris* held that the officer could testify that the defendant "appeared to be under the influence of drugs." 601 A.2d at 26. However, *Harris* also saw no error in permitting the officers involved in the case "to testify that when they encountered appellant the night of the incident they believed that Harris was under the influence of a substance...." *Id.* Officer Lieffring was asked: "Officer, when you saw the defendant, did you believe she was under the influence of narcotics"? Under *Harris,* this was a proper question, to which he responded: "At the time, no." The trial court did not abuse its discretion in allowing into evidence Officer Lieffring's testimony that he did not believe Ms. Moore was under the influence of narcotics when he saw her.

Based on the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*